**Petition of SPROULE.**
**No. 54295–Y.**

District Court, S. D. California, Central Division.
July 9, 1937.

C. W. Buttz, of Devils Lake, N. D., for petitioner.

H. B. Terrill and Albert Del Guercio, both of Los Angeles, Cal., for the Naturalization Service.

YANKWICH, District Judge.

Mary Edith Sproule, to whom we shall refer as the petitioner, has filed a petition for naturalization under the provisions of section 4 of the Act of September 22, 1922 (42 Stat. 1021–1022), as amended by the Act of July 3, 1930 (46 Stat. 854, § 2 (a) 8 U.S.C.A. § 369), which reads:

"Sec. 4. (a) A woman who has lost her United States citizenship by reason of her marriage to an alien eligible to citizenship or by reason of the loss of United States citizenship by her husband may, if eligible to citizenship and if she has not acquired any other nationality by affirmative act, be naturalized upon full and complete compliance with all requirements of the naturalization laws, with the following exceptions:

"(1) No declaration of intention and no certificate of arrival shall be required, and no period of residence within the United States or within the county where the petition is filed shall be required;

"(2) The petition need not set forth that it is the intention of the petitioner to reside permanently within the United States;

"(3) The petition may be filed in any court having naturalization jurisdiction, regardless of the residence of the petitioner;

"(4) If there is attached to the petition, at the time of filing, a certificate from a naturalization examiner stating that the petitioner has appeared before him for examination, the petition may be heard at any time after filing.

"(b) After her naturalization such woman shall have the same citizenship status, as if her marriage, or the loss of citizenship by her husband, as the case may be, had taken place after this section, as amended, takes effect [July 3, 1930]."

She is a native of Canada, a subject of Great Britain, born in Van Camp Mills, Canada, January 19, 1867, of alien parents. She claims to have resided in the United States continuously since September, 1912. She migrated with her parents and other members of her family to the United States in 1883, settling in Pembina county, Dakota Territory. On May 9, 1888, she married Ezra Sproule, a native and citizen of Canada, at Drayton, N. D. Shortly after the marriage, they removed to Canada, returning to the territory of North Dakota in September, 1888. They returned to Canada in the fall of 1890, and there took up their permanent domicile, returning to Los Angeles, Cal., in September, 1912, where the petitioner has resided ever since.

The husband has never been naturalized in this country. The applicant states that he died in 1923, but has been unable to produce evidence of his death. The petitioner's father, Reuben Van Camp, declared his intention to become a citizen of the United States in the district court of Pembina county, Dakota Territory, on September 30, 1879, but did not complete his naturalization during her minority.

The petitioner claims that, through this declaration of intention, she acquired inchoate right to citizenship, which later matured into citizenship when the Territory of Dakota was admitted into the Union on November 2, 1889,—a citizenship which she did not lose by marriage to a British subject.

The position of the petitioner is rather inconsistent. She applied for citizenship under an act which is commonly called the "Repatriation Act" (40 Stat. 340) and which *implies* loss of citizenship by native-born or naturalized Americans through marriage to aliens. Her contention, in the briefs filed in her behalf, is that she has always been an American citizen, and that, if her petition for naturalization is denied, it be done upon the ground that she is already a citizen of the United States.

■■■ As whatever rights she acquired deraign from her father's declaration of intention, it is well to bear in mind that the basis of citizenship in the United States is the English doctrine under which nationality meant birth within the allegiance of the king. United States v. Wong Kim Ark (1898) 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890. The control over naturalization, vested in the Congress by the Constitution, gave to it the power to enact laws granting citizenship to persons of alien birth residing within the United States and thereby conferring upon them all the rights of native-born persons. Constitution of the United States, art. 1, § 8, cl. 4; Luria v. United States (1913) 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101. The Constitution sought to overcome one of the colonists' grievances against the English king. In the Declaration of Independence, he was charged with "obstructing the laws for naturalization of foreigners."

■■■ The declaration of intention (8 U.S. C.A. § 373) is merely the first step in the process of naturalization. It does not confer citizenship.

As said by our own Circuit Court of Appeals in Johnson v. Nickoloff (C.C.A.9, 1931) 52 F.(2d) 1074, 1075: "A person does not become a citizen of the United States until the procedure of naturalization has been fully complied with and an order divesting him of his former nationality and making him a citizen of the United States has been signed by a judge of a court having jurisdiction. 26 Op.Attys.Gen. 611."

Although the declarant acquires an inchoate nationality, he remains an alien until the naturalization is completed. Wilson on International Law (2d Ed.) 1927, p. 136; In re Polsson (C.C.Cal.1908) 159 F. 283; In re Moses (C.C.N.Y.1897) 83 F. 995; Frick v. Lewis (C.C.A.6, 1912) 195 F. 693; United States v. Bell (D.C.N.Y.1918) 248 F. 992. And this status is not changed by the fact that the law of the state of the declarant's residence may confer upon him the elective franchise or other privileges of citizenship, or even the right to hold public office. An alien he remains. City of Minneapolis v. Reum (C.C.A.8, 1893) 56 F. 576.

■■■ The rights flowing from the declaration of intention are strictly construed. They will not be extended beyond the obvious limits of the proceeding. Terrace v. Thompson (1923) 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255; U. S. v. Manzi (1928) 276 U.S. 463, 48 S.Ct. 328, 72 L.Ed. 654.

In the light of these principles, we consider the grounds upon which the petitioner relies in seeking naturalization.

The act under which the petition is filed seeks to restore citizenship to women who, having been American citizens, by birth or naturalization, have lost it through marriage to an alien or through the husband's loss of citizenship.

From the beginning of our national life, legislative bodies have sought to recognize the right of American citizens to expatriate themselves, on the one hand, and, on the other hand, to preserve to those who reside abroad without actually expatriating themselves the right of American citizenship against the claims of countries of their residence. Thus we find that in 1786, Virginia passed an act providing that any citizen might relinquish his citizenship and depart from the commonwealth and "thenceforth be deemed no citizen." See Scott's Cases on International Law (1922) p. 154. On July 27, 1868, the Congress of the United States enacted a statute (15 Stat. 223 [8 U.S.C.A. §§ 13–15 and notes]) claiming American citizenship for American citizens residing abroad and disavowing claims of foreign countries to their allegiance. See 8 U.S.C.A. § 15. Through a series of treaties, beginning in 1868, known as the Banccroft Treaties, this right was recognized, as were also the reciprocal rights of the contracting countries to reclaim the allegiance of naturalized persons who have returned to the country of their birth and resided therein a certain length of time. In 1907 (34 Stat. 1228), the law was enacted under which a naturalized citizen forfeits citizenship if (subject to certain exceptions) he resides within the country of his birth for a period of two years or in any other country for a period of five years. 8 U.S.C.A. § 17.

With regard to women, one of the universally recognized methods for change of nationality is marriage. Practically all European countries, a large number of Latin-American countries, countries of the Near and Far East, such as China, Japan, Siam, and Persia, confer upon the wife the nationality of her husband. Fauchille: Droit International Public, 8 Ed. (1922) vol. 1. p. 150 et seq.

In the United States, prior to the Act of March 2, 1907, no statutory enactment existed imposing upon American women the citizenship of their husbands. The judicial pronouncements lacked uniformity. Nevertheless, the better reasoned ones followed the general rule of international law, especially when the marriage was followed by removal of the wife to the country of her husband's birth. Ruckgaber v. Moore (C.C.N.Y.1900) 104 F. 947; In re Fitzroy (D.C.Mass.1925) 4 F.(2d) 541; In re Page (D.C.Cal.1926) 12 F.(2d) 135; In re Krausmann (D.C.Mich.1928) 28 F.(2d) 1004; In re Lynch (D.C.Cal.1929) 31 F.(2d) 762. To me, the principle declared in these cases seems well grounded. This not only because it applies a principle of law recognized throughout the civilized world, but also because it is logically sound. It is true that the disabilities under which a married woman labored at common law did not extend to her political status. Shanks v. Dupont (1830) 3 Pet. 242, 7 L.Ed. 666. Nevertheless, when marriage to an alien occurs, by the law of most countries, the nationality of the husband is conferred upon the woman. If the marital domicile continues to be in the United States, there is reason for applying to the woman's status the presumption against loss of nationality. But when the woman follows her husband to a foreign country, in which the nationality of her husband would be imposed upon her, she has severed the last tie which bound her to American nationality, the tie of residence in the country of her nativity. There is then no reason left for allowing her to maintain a double allegiance. In following her husband, she must have said, as did Ruth of old: "For whither thou goest, I will go; and where thou lodgest, I will lodge; thy people shall be my people, and thy God my God." Ruth 1:16.

The diplomatic precedents which seem to recognize a reversion of nationality upon the return of the woman to the United States after death or divorce (3 Moore, International Law Digest, pp. 454–456) do not command approval. They are administrative determinations in nonadversary proceedings, before state department officials, who, by the very nature of their duties, would resolve all doubts in favor of American citizenship.

When we are dealing with a judicial proceeding, under a special statute, which requires that the applicant show compliance with certain requirements before she is repatriated, the construction, if doubts exist, must be in favor of the Government. See Hauenstein v. Lynham

(1879) 100 U.S. 483, 25 L.Ed. 628; Swan & Finch Co. v. United States (1903) 190 U.S. 143, 23 S.Ct. 702, 47 L.Ed. 984; Zartarian v. Billings (1907) 204 U.S. 170, 27 S.Ct. 182, 51 L.Ed. 428; Tutun v. United States (1926) 270 U.S. 568, 578, 46 S.Ct. 425, 427, 70 L.Ed. 738; United States v. Schwimmer (1929) 279 U.S. 644, 649, 49 S.Ct. 448, 449, 73 L.Ed. 889; United States v. Rodgers (C.C.A.3, 1911) 185 F. 334. And see 3 Moore, International Digest, § 413. Nationality once lost cannot be restored except through naturalization. Fauchille, Op.Cit. 879.

█ The act under which the application is made evidences the intention of the Congress to facilitate the restoration of nationality to women who come under it.

█ The burden of showing compliance with it rests upon the applicant in each instance.

We do not believe that the petitioner here has met this burden.

█ She claims citizenship through her father's declaration of intention (which was not followed by naturalization during her minority), the Organic and Enabling Acts of the Territory of Dakota, and the doctrine declared in Boyd v. Nebraska ex rel. Thayer (1892) 143 U.S. 135, 12 S.Ct. 375, 36 L.Ed. 103. Section 5 of the Act of Congress of March 2, 1861 (12 Stat. 239, 241), providing a temporary government for the Territory of Dakota, provided: "Sec. 5. That every free white male inhabitant of the United States above the age of twenty-one years, who shall have been a resident of said Territory at the time of the passage of this act, shall be entitled to vote at the first election, and shall be eligible to any office within the said Territory; but the qualifications of voters and holding office at all subsequent elections shall be such as shall be prescribed by the legislative assembly: Provided, *That the right of suffrage and of holding office shall be exercised only by citizens of the United States and those who shall have declared on oath their intention to become such, and shall have taken an oath to support the Constitution of the United States.*" (Italics added.)

Section 3 of the Enabling Act for the Dakotas, approved February 22, 1889, provided, in part, as follows: "That all persons who are qualified by the laws of said territories to vote for representatives to the legislative assemblies thereof, are here-by authorized to vote for and choose delegates to form conventions in said proposed states."

The elective franchise in the territory was extended to: (1) Citizens of the United States; (2) those who had declared upon oath their intention to be such; (3) those who had taken an oath to support the Constitution of the United States; and (4) to persons who had been declared by law to be citizens of the territory. Territory of Dakota Political Code, § 47, Levisee's Revised Codes of the Territory of Dakota 1883. By the Constitution of North Dakota, the voting privilege was limited to male persons over the age of twenty-one, who, in addition to satisfying residential requirements of one year within the state, six months within the county, and ninety days within the precinct, were, (1) citizens of the United States, or (2) had declared their intention to become citizens *conformably to the naturalization laws of the United States.* Constitution of North Dakota, § 121.

By section 128 of the same Constitution, women were allowed to vote at school elections provided they satisfied "the qualifications enumerated in Section 121 of this article as to *age, residence* and *citizenship.*" (Italics added.)

Section 13 of Political Code of North Dakota provides:

"Who are citizens. The citizens of the state are:

"1. All persons born in this state and residing within it, except the children of transient aliens and of alien public ministers and consuls;

"2. All persons born out of this state and who are citizens of the United States and residing within this state." R.C.1905, § 11; R.C.1895, § 11.

Section 18 of the same Code provides:

"Persons not citizens. Persons in this state not its citizens, are either:

"1. Citizens of other states; or,

"2. Aliens." R.C.1905, § 16; R.C.1895, § 16.

Voting and citizenship are not necessarily coexistent. One may be a citizen without having the right of the vote. Women were such for centuries. At the same time, the right to vote does not confer citizenship, and states cannot, by conferring it, turn aliens into citizens of the United States. City of Minneapolis, v. Reum,

supra. However, repeatedly, in our history, in admitting new states into the Union, the Congress of the United States has performed acts of collective naturalization. This was done by the act admitting Nebraska, discussed in Boyd v. Thayer, supra, and the act relating to the annexation of Texas, discussed in Contzen v. United States (1900) 179 U.S. 191, 21 S. Ct. 98, 45 L.Ed. 148. The effect of acts of this character is thus stated in Boyd v. Thayer, supra, 143 U.S. 135, at page 170, 12 S.Ct. 375, 385, 36 L.Ed. 103: "Admission on an equal footing with the original states, in all respects whatever, involves equality of constitutional right and power, which cannot thereafterwards be controlled, *and it also involves the adoption as citizens of the United States of those whom congress makes members of the political community, and who are recognized as such in the formation of the new state with the consent of congress.*" (Italics added.)

To be "recognized" as a citizen of the territory of North Dakota as required by this decision, the petitioner, in the light of the organic and enabling acts, and of the Constitution and laws of the territory already quoted, would have to be either (1) a citizen of the United States or (2) one who had declared on "oath her intention to become such" and had taken "an oath to support the Constitution of the United States."

She is in neither class.

And her petition must be denied unless, as she contends, the inchoate right which she acquired through her father's declaration of intention, and *which did not mature into citizenship, during her minority,* stand her in stead of the other requirements.

Boyd v. Thayer, supra, upon which the petitioner relies in her claim for citizenship, does not help her. Briefly, the facts there were: James E. Boyd was born in Ireland of Irish parents in 1834. He was brought to this country in 1844 by his father, Joseph Boyd, who settled in Ohio, and on March 5, 1849, he declared his intention to become a citizen of the United States. In 1855, James E. Boyd voted in Ohio *as a citizen under the belief that his father had completed his naturalization in 1854.* In 1856, he removed to the Territory of Nebraska. In 1857, he was elected to serve as county clerk of Douglas county. In 1864, *he was sworn into mili-*

*tary service and served as a soldier of the Federal Government to defend the frontier from an attack of Indians;* in 1866, he was elected a member of the Nebraska Legislature and served one session; in 1871, he was elected a member of the convention which framed the State Constitution; in 1880, he was elected and acted as president of the city council of Omaha; and in 1881 and 1885, respectively, was elected mayor of that city, serving in all four years. From 1856 until the state was admitted, and from then to his election as Governor, he had voted at every election, territorial, state, municipal, and national. *Prior to the admission of the state he had taken the oath of office required by law in entering upon the duties of the offices he had filled and sworn to support the Constitution of the United States and that of Nebraska.* In 1888, he was elected Governor of the State, taking the oath of office and entering upon the discharge of his duties. His right to hold office was challenged upon the ground that he was not a citizen of the United States. The state superior court so held. But the Supreme Court of the United States sustained Boyd's contention that the inchoate right of citizenship which he acquired through his father's declaration of intention ripened into citizenship through the admission of Nebraska and by his taking the oath under Nebraska's Organic Law when he occupied various offices. The gist of the opinion is contained in the following quotation:

"Clearly, minors acquire an *inchoate* status by the declaration of intention on the part of their parents. If they attain their majority before the parent completes his naturalization, then they have an election to repudiate the status which they find impressed upon them, and determine that they will accept allegiance to some foreign potentate or power rather than hold fast to the citizenship which the act of the parent has initiated for them. Ordinarily this election is determined by application on their own behalf, but *it does not follow that an actual equivalent may not be accepted in lieu of a technical compliance.* * * * We are of opinion that James E. Boyd is entitled to claim that, if his father did not complete his naturalization before his son had attained majority, the son cannot be held to *have lost the inchoate status he had acquired by the declaration of intention, and to have elected to become the subject of a foreign power,*

but, on the contrary, that the oaths he took and his action as a citizen entitled him to insist upon the benefit of his father's act, and placed him in the same category as his father would have occupied if he had emigrated to the territory of Nebraska; that, in short, he was within the intent and meaning, effect and operation, of the acts of congress in relation to citizens of the territory, and was made a citizen of the United States and of the state of Nebraska under the organic and enabling acts and the act of admission." Boyd v. Thayer, supra, 143 U.S. 135, at pages 178, 179, 12 S.Ct. 375, 388, 36 L.Ed. 103. (Italics added.)

The only similarity between the present case and the Boyd Case lies in the fact that the father in each instance declared his intention to become a citizen, but never completed the naturalization during his child's minority. The Supreme Court in Boyd v. Thayer, supra, stresses the fact that Boyd had taken oath to support the Constitution of the United States when he occupied various offices before the admission of Nebraska as a territory. This language is used: "He had taken, prior to the admission of the state, the oath required by law in entering upon the duties of the offices he had filled, and sworn to support the constitution of the United States and the provisions of the organic act under which the territory of Nebraska was created. For over 30 years prior to his election as governor he had enjoyed all the rights, privileges, and immunities of a citizen of the United States, and of the territory and state, as being in law, as he was in fact, such citizen." Boyd v. Thayer, supra, 143 U.S. 135, at page 179, 12 S. Ct. 375, 388, 36 L.Ed. 103. As, under the Nebraska Enabling Act, citizenship was extended to those who "shall have declared on oath their intention to become such, and shall have taken an oath to support the Constitution of the United States" (10 Stat. 279, § 5), the court, in the face of an unquestioned exercise of citizenship rights for a period of thirty years, held that the election to various offices and the taking of the oath prior to the admission of Nebraska were sufficient to complete the naturalization. The court accepted these oaths as an "actual equivalent" for the more technical application for citizenship. They evidenced Boyd's "election" to become a citizen. The court, by this decision, did not mean to confer citizenship automatically upon the minor child of any territorial resident who may have declared his intention to become a citizen and never completed it. See Contzen v. United States, supra; United States v. Manzi, supra; Zartarian v. Billings, supra; 3 Moore, International Digest, § 413.

The petitioner here left the Territory of Dakota as the wife of an alien, before that territory was admitted into the Union. She returned only to leave again the year following the admission to become a permanent resident of Canada. She cannot claim derivative citizenship through her father (8 U.S.C.A. §§ 7 and 8) because his citizenship was not completed before her majority. She did not comply with section 2167 of the Revised Statutes, now repealed, which permitted a minor alien who had resided in the United States three years preceding his arrival at majority and continued to reside therein, upon reaching the age of twenty-one and after a residence of five years, including the three years of minority, to be admitted as a citizen of the United States without making, during minority, the declaration of intention required of others. Nor did she take any oath to support the Constitution of the United States of the type which the court in Boyd v. Thayer, supra, considered the "actual equivalent" of the compliance with the section. On the contrary, she married an alien, took up her residence, which extended over a period of twenty-two years, in a country, the laws of which, recognized by treaty with the United States, impressed her with the citizenship of her husband. Treaty of September 16, 1870, 16 U.S.Statutes 775; Jenns v. Landes (C. C.Wash.1898) 85 F. 801; United States v. Reid (C.C.A.9, 1934) 73 F.(2d) 153. Her "inchoate" rights never having matured into citizenship at the time of her marriage to an alien, she was an alien at the time. Such she remained. The object of the statute under which the proceeding is instituted is to restore citizenship to women who have lost it by marriage.

Here no citizenship was lost.

Hence there is nothing to restore. The petition for naturalization will, therefore, be denied.

Exception to the petitioner.